# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-1116


**STATE OF LOUISIANA**

**VERSUS**

**SANTIAGO ALONSO GONZALEZ, SR.**
**AKA SANTIAGO ALONSO GONZALEZ**
**AKA SONTIAGO GONZALEZ**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 74690
HONORABLE STEPHEN B. BEASLEY, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## PHYLLIS M. KEATY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Phyllis M. Keaty, and
D. Kent Savoie, Judges.


**SENTENCED AMENDED AND AFFIRMED AS AMENDED.**
**REMANDED WITH INSTRUCTIONS.**

**Don M. Burkett**
**District Attorney**
**Anna L. Garcie**
**Assistant District Attorney**
**Post Office Drawer 1557**
**Many, Louisiana  71449**
**(318) 256-6246**
**Counsel for Appellee:**
     **State of Louisiana**

**Mitchell J. Creel**
**Creel Law Firm**
**Post Office Box 276**
**Greenville, Mississippi  38702**
**(662) 332-3383**
**Counsel for Defendant/Appellant:**
     **Santiago Alonso Gonzalez, Sr.**

**Sarah L. Ottinger**
**Juvenile Justice Project of Louisiana**
**2563 Bayou Road, Second Floor**
**New Orleans, Louisiana  70119**
**(504) 258-6537**
**Counsel for Defendant/Appellant:**
     **Santiago Alonso Gonzalez, Sr.**

**KEATY, Judge.**

Defendant, Santiago Alonso Gonzalez, Sr., was charged by bill of information filed on April 30, 2015, with aggravated crime against nature, a violation of La.R.S. 14:89.1(A)(2)(a).[1] Trial by jury commenced on January 26, 2017, and the following day, the jury found Defendant guilty of the responsive verdict of attempted crime against nature, a violation of La.R.S. 14:27 and La.R.S. 14:89. Defendant filed a Motion for New Trial on March 2, 2017, alleging the verdict was contrary to the law and evidence. Several weeks later, he filed a First-Amended Motion for New Trial on the basis of newly discovered evidence. After a hearing, the trial court denied Defendant's new trial request without reasons. On May 25, 2017, Defendant was sentenced to serve seven years at hard labor, the sentence was suspended, and Defendant was placed on supervised probation for six years.

Defendant appealed and is now before this court asserting the following assignments of error: 1) the trial court erred in denying his First-Amended Motion for New Trial; 2) the trial court imposed an illegal sentence of six years supervised probation; 3) the trial court imposed an illegal condition of supervised probation; and, 4) a portion of the Order of Notification to Sex Offender is erroneous.

## DISCUSSION

*Facts*

Defendant's biological daughter, E.G.,[2] claimed that Defendant forced her to have sexual intercourse with him every few weeks between March 4, 2012, and April 1, 2015.

---

[1] The bill of information was later amended to correct Defendant's name.

[2] The victim's initials are used in accordance with La.R.S. 46:1844(W).

***Denial of Defendant's First Amended Motion for New Trial***

In his first assignment of error, Defendant contends the trial court erred in denying his First Amended Motion for New Trial, in violation of La.Code Crim.P. art. 851(B)(3) and his rights under La.Const. art. 1, § 2 and § 16 and U.S. Const. amend. VI and XIV.

> The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
>
> . . . .
>
> (3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.

La.Code Crim.P. art. 851(B).

> A motion for a new trial based [upon newly discovered evidence] shall contain allegations of fact, sworn to by the defendant or his counsel, showing:
>
> (1) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discovered before or during the trial;
>
> (2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence;
>
> (3) The facts which the witnesses or evidence will establish; and
>
> (4) That the witnesses or evidence are not beyond the process of the court, or are otherwise available. . . .

La.Code Crim.P. art. 854.

In *State v. McKinnies*, 13-1412, pp. 9-14 (La. 10/15/14), 171 So.3d 861, 869-72 (footnotes omitted), the supreme court explained:

> La.C.Cr.P. art. 858 limits our review of the trial court's ruling on the new trial motion: "In reviewing the granting or the refusal to grant a new trial, neither the appellate nor the supervisory jurisdiction of the Supreme Court may be invoked, except for error of law." Therefore, we review the trial court's ruling on the new trial motion only for legal error. An abuse of the trial court's discretion in ruling

2

on a new trial motion on the ground of newly discovered evidence presents a question of law.

. . . .

"When ruling on an Article 851(B)(3) motion, a trial judge's duty is not to weigh the new evidence as though he were a jury deciding guilt or innocence or to determine what is true or false in light of the additional information. In other words, the trial judge is not to assess the newly discovered evidence as though he were a thirteenth juror." Instead, "[t]he discretion vested in the trial judge in passing on a motion for a new trial based on the ground of newly discovered evidence in a criminal case is to be exercised in determining the diligence shown, the truth of the matters stated, and the materiality and probability of their effect, if they are believed to be true."

"[A] motion for a new trial is properly rejected when it is based on evidence which should have, with reasonable diligence, been discovered before or during the trial. *State v. Jones*, 344 So.2d 1036 (La.1977); *State v. Rossi*, 273 So.2d 265 (La.1973)." *State v. Marcal*, 388 So.2d 656, 662 (La.1980), *appeal dismissed, cert. denied*, 451 U.S. 977, 101 S.Ct. 2300 (1981).

The basis of Defendant's original motion for new trial was that the State failed to present any physical or medical evidence to corroborate his daughter's claim that he forced her to have sex with him. In his amended motion for new trial, Defendant stated that Marsha Meshell, E.G.'s grandmother and his mother-in-law, had written a letter on his behalf claiming that E.G. told her she made up the charges because she was angry at her father. Defendant explained that on March 22, 2017, Meshell informed his counsel that she knew E.G. "had admitted to deception when making accusations of aggravated rape" against Defendant. Defense counsel attached an affidavit to the amended motion, wherein he stated:

> THAT he conducted reasonable due diligence in his search for evidence in the above-referenced matter; and was unaware of the existence of the evidence alleged by the child-complainant's grandmother Marsha Mechell [sic] prior to or during the defendant's trial;

3

THAT prior to the said trial, the defendant was court-ordered not to contact anyone from his immediate family; and thus it was not reasonable for him to be aware that the grandmother of the child-complainant would have knowledge concerning said recantation[.]

The undated letter written by Meshell, which was also attached to the amended new trial motion, provided as follows:

My name is Marsha Meshell, mothe-in-law [sic] of Santiago Gonzelez [sic] Sr. I have known him since he married my daughter, Melinda Meshell Gonzeles [sic], which was about 18 yrs. He is a good man, a good Father to his children and tries to raise them right. I know in my Heart this Man is innocent. He wants his children to grow up and be somebody and not doing things wrong. I know he did not do anything to [E.G.], his daughter, because she has said to me several times he didn't do it. [E.G.] said what she did because she was mad at her Dad. He didn't want her to date and get her education. She wanted to do what she wanted to no matter what. I believe in my Heart he is innocent and God knows, Santigo [sic] should be freed.

Defendant called two witnesses at the April 27, 2017 hearing on his motion for new trial. The first was Defendant's sister-in-law and E.G.'s aunt, Marsha Meshell McDonald.[3] McDonald stated that sometime after the trial, she told defense counsel that E.G. told her that "she lied on him, on her dad." McDonald acknowledged having spoken to defense counsel twice in the past several years regarding an unrelated matter, but she claimed to not know that counsel represented Defendant until after his trial. McDonald testified that she mentioned E.G.'s recantation to Detective Aaron Mitchell four or five months before the trial, and he said he would get someone call her. McDonald identified a member of the district attorney's staff, Natalie Rowe, who was sitting in the courtroom during the hearing, as someone else whom she told about E.G. having confided in her that the charged offenses did not occur.[4] McDonald explained that she and Rowe had spoken at McDonald's workplace. Rowe told McDonald that she would pass the information on to her office and someone would get back in touch with McDonald.

_____

[3] To avoid confusion, we will refer to E.G.'s aunt as "McDonald."

[4] Rowe was asked to leave the courtroom during the remainder of McDonald's testimony.

4

According to McDonald, no one from the district attorney's office followed up on the matter and neither did she. McDonald confirmed that she would have been available to testify at Defendant's trial. On cross-examination, McDonald initially claimed that she did not tell her mother, Meshell, about what E.G. told her; however, she later remembered discussing the matter with Meshell. McDonald was sure she never told her sister, Melinda Gonzalez, E.G.'s mother, about E.G.'s alleged recantation.

Defendant's mother-in-law, Marsha Meshell, was the second witness called by the defense. Meshell confirmed that she had met defense counsel once before in an unrelated matter that took place before E.G. told her that the charges against Defendant were untrue. When asked by defense counsel as to why she did not reach out to him before Defendant's trial, Meshell stated:

> Well, I thought it was gonna [sic] be, like, when he came to trial, you know. I was hoping and praying, you know, the Good Lord, "Look. You know, in my heart I know he didn't do it." And then when she told me this, you know, I even asked her, I said, "Why don't you go forth and tell the truth?" I said, "You know, because that's your father." I said, "You only have one father." And I said, "You know, I don't know what made you say it or anything," but I said, "if you're telling me that he did not do it, please go and tell the truth."

Meshell described the circumstances of E.G.'s recantation, as follows:

> Well, her mother was not at home at the time and we were talking. And the words that she told me, that he didn't do it, but if she didn't come up here and say she did and they thought that - the Court thought she had lied, that she would be in trouble and get sent off.

Meshell stated that she had only one such converstation with E.G., and she guessed that it occurred five or six months ago, before Defendant's January 26, 2017 trial. Meshell testified that she discussed E.G.'s recantation with her daughters, Melinda and McDonald, but she did not tell anyone else because she was not sure of who to speak to, and she was not sure if they would believe her. According to Meshell,

McDonald told her that E.G. had recanted to her as well. Meshell then read the letter she sent to defense counsel to the jury.

On cross-examination, Meshell acknowledged that she was present at E.G.'s house on several occasions when an employee of the Department of Children and Family Services (DCFS) came to visit. Upon being questioned as to whether it was true that she and E.G.'s mother, Melinda, "began screaming up in the victim's room" after the guilty verdict was rendered, Meshell admitted she was upset and that she and Melinda got "a little loud," but she denied that there was any screaming.

The State called three witnesses to oppose Defendant's motion for new trial. Natalie Rowe testified that she worked for the Sabine Parish District Attorney's Office as support staff. She denied that McDonald ever told her that E.G. recanted her allegations against Defendant. Rowe described a conversation she had with McDonald as follows:

> And she asked me about did I know or could I tell her when the case was upcoming, and I said, "Which case?" And she said two. She mentioned one name and then she said Gonzalez and I said, "I don't know exactly when it's coming up, but you can call the DA's office and we'll let you know." Other than that, I don't recall having any other conversation with her about this case.

Rowe testified that she could specifically say she did not have a conversation with McDonald about anyone recanting a story.

Karen Williams, victim coordinator of the Sabine Parish District Attorney's Office, testified that she was present when the assistant district attorney met with E.G. several times for trial preparation. Although E.G.'s mother, Melinda, was with her, Melinda never told Williams or the assistant district attorney that she had information regarding E.G. recanting her story. Williams further indicated she

never spoke to Meshell. According to Williams, after the jury returned its verdict, she heard Melinda and Meshell screaming in the "victim's room."

Tiffany Frazier, a DCFS employee, testified that she began visiting E.G.'s family in October 2016. She stated that she was in the Gonzalez family home prior to trial when Melinda was not present and Meshell was taking care of the children. Regarding those visits, Frazier's explained:

> A [Meshell] talked more than E.G. did. She made it known that she did not believe E.G. She thought that she was lying.
>
> Q Let me stop you there. Did she ever say to you, "Ma'am, E.G.'s told me she's lying?
>
> A No, ma'am.
>
> Q So she said she didn't believe her. She thought she was lying, but she never said to you, "I know she's lying because she's told me she lied?"
>
> A Correct.
>
> Q Okay. And this was prior to the trial?
>
> A Yes.

At the conclusion of the hearing, the trial court denied Defendant's amended motion for new trial without reasons. Citing *State v. Ward*, 14-1923 (La. 6/30/15), 167 So.3d 592, Defendant contends the trial court erred in denying his amended motion for new trial.[5] The defendant in *Ward* was convicted of aggravated rape and attempted aggravated rape and filed a motion for new trial based on newly discovered evidence. In reversing the trial court's denial of the motion for new trial, the supreme court noted the entire case hinged on the "ever-evolving" testimony of the victim, explaining:

> After a searching review of the record in this case, we are satisfied that this new evidence was discovered after trial and that

---

[5]Defendant cites this case as *State v. Maise*. Maise and Ward were co-defendants and their applications for writ of review were consolidated. The published opinion bears the title *State v. Ward*, and we refer to it as such.

defense counsel's failure to discover this evidence was not attributable to any lack of due diligence on their part. Further, given the fact that the State's entire case against these defendants—each of whom is currently serving a sentence of life in prison based on these convictions—hinged on the ever-changing testimony of R.P. concerning the critical issue of penetration which was *eventually* corroborated in some respects when A.L. altered her testimony mid-trial, there is no question that this newly discovered evidence undermining both R.P.'s and A.L.'s credibility is material. . . . Under these unique circumstances, we find the trial court erred in failing to grant defendants a new trial given the objectively tenuous credibility of both of these witnesses—one of whom offered different versions of her story at virtually every juncture of the investigation and prosecution of these defendants and the other who, *after* receiving transactional immunity from the State, offered two different iterations of her story on successive days of testimony.

*Id.* at 597-98 (footnotes omitted).

Defendant contends that, as in *Ward*, he did not discover that E.G. told both her grandmother and aunt that her allegations against Defendant were false until after trial. Defendant submits that, because there were court orders prohibiting communication between Defendant and his wife and because his attorney could not speak to Melinda without her counsel present, defense counsel did not discover the evidence prior to trial despite due diligence.

Defendant asserts that E.G.'s statements changed a great deal when it came to describing "what she claimed [he] did around the critical issue of penetration." Defendant argues that at the time E.G. reported the offense, she described contact that increased to penetration over time. However, by trial, she testified to full penetration and ejaculation in the very first incident she described. Defendant submits that the introduction of E.G.'s statements to her grandmother and aunt would probably produce a different verdict on retrial.

The State counters that the trial court did not err in denying Defendant's amended motion for new trial because, unlike the victim in *Ward*, E.G.'s version of what Defendant did to her did not change. The State then challenges the credibility

8

of Meshell and McDonald, noting the many inconsistencies in their testimonies. It points out that McDonald wavered on whether she told her mother, Meshell, that E.G. had confessed to making up the allegations against Defendant. In addition, the State submits that Rowe denied discussing this case with McDonald, in direct contravention of McDonald's testimony. With regard to E.G.'s grandmother, Meshell, the State notes that in her letter to defense counsel she claimed that on several occasions, E.G. told her that her father had not done anything, but on direct examination, Meshell testified that E.G. only recanted her allegations to her on one occasion. Moreover, given the fact that Meshell was in E.G.'s home on several occasions when someone from the district attorney's office and from DCFS came by, she could have told them that E.G. had confessed to making up the charges against Defendant. Finally, the State submits that the defense's new witnesses "could have been procured with the exercise of the slightest diligence."

Because Defendant argues the statements allegedly made by E.G. would have produced a different verdict on retrial, we will discuss the testimony presented at Defendant's trial. The State called seven witnesses in its case in chief. Amy Johnson was the guidance counselor at Many Junior High on April 14, 2015. Johnson testified that on that date, several students reported to her that E.G. stated she might be pregnant, and her father had had sexual relations with her. As a result, Johnson called E.G. in to speak with her. E.G. confirmed she had made such a statement but did not want to share anything with Johnson. Johnson stated she reported the matter to DCFS, explaining:

> When she met with the DCFS person, originally, she said that - or the DCFS person said that she denied the claims. Then she came back, because I told E.G. that, "If something did happen, you need to be honest and you need to tell them the truth. Whether it happened or it didn't happen, you need to be honest. And if you need me to call them back, I will call them back." So she said, "I need to talk to them." So I called them back.

Johnson was further questioned as follows:

Q    Okay. So besides that one instance, there was no other time she ever denied making that claim against her father, correct?

A    Correct.

Megan Goff, a DCFS employee, testified that she went to E.G's school to speak with her. E.G. told Goff that she had never had sex, that she was Catholic and very religious, and that she was afraid she might be pregnant. Because E.G. denied that anyone had "hurt her," Goff returned to her office. Just as she was arriving there, Johnson called and asked her to return to the school because E.G. had more to say. At that time, E.G. disclosed to Goff that she had been raped by her father. E.G. then requested that someone contact her mother. Goff stated that after E.G.'s mother, Melinda, arrived at school and was told about E.G.'s allegations against Defendant, Melinda accused E.G. of lying and "[Melinda] through [sic] herself on the floor of the junior high." According to Goff, E.G. was later hospitalized for suicidal and homicidal ideations and for self-mutilation.

Goff testified that after Defendant was arrested, she was told that E.G. said Defendant had been "coming around" their family home. Goff questioned E.G. about the matter, and E.G. admitted that Defendant had not actually been to the home. Goff testified that E.G. was "fearful" that Defendant "was going to come back." E.G. admitted to Goff that after returning from foster care to live with her mother, she snuck out of the house a couple of times to meet a boy. Goff was further questioned as follows:

Q    Okay. So not quite two years later, okay, we are here, in all of that time - she told you when she had fibbed - when she had lied about something, she came clean about it. At any point since April 14, 2015, when she broke down in the counselor's office, has she ever recanted and said, "I made this up. My dad didn't do this,"?

A    Never.

10

Q      Okay.  Throughout all of her hospital stays, are you familiar with her - her hospital stays in the - you know, in Brentwood and Long Leaf, has she ever, in any of the things she wrote, or any of the counselors that she talked to, said, "This didn't happen,"?

A      No. Never.

On cross-examination, Goff was shown copies of E.G.'s medical records from Brentwood Hospital and was asked whether E.G. was ever diagnosed with psychosis while there.  Goff replied that the records did not reveal a diagnosis of psychosis, however, she was prescribed medication to treat psychosis.  Goff noted that at E.G.'s discharge from Brentwood, she was diagnosed with major depressive disorder and anxiety.

Aaron Mitchell, a juvenile detective with the Sabine Parish Sheriff's Office, testified that he received a call from Megan Goff with DCFS on April 14, 2015. He met Goff at the local high school where he learned that a female juvenile stated that "her father had done some things to her and she thought that she was pregnant."  Detective Mitchell set up a forensic interview for E.G. at Project Celebration.  After observing E.G.'s interview, Detective Mitchell arrested Defendant at his home.  He stated that he talked to E.G.'s mother who "was highly irate and didn't believe the child."

Joanna Pleasant, the director of the Child Advocacy Center at Project Celebration, testified that she conducted two forensic interviews of E.G., the first on April 14, 2015, and another on April 7, 2016.  Pleasant explained that the purpose of a forensic interview is to get the child to talk in a safe environment and that she does not form any opinions or draw conclusions regarding the interviews she conducts.

Videotapes of those interviews were played for the jury while Pleasant was on the witness stand.  In the April 14, 2015 interview, E.G. told Pleasant that her

father began raping her when she was thirteen and would do so every few weeks. She was fourteen years old at the time of the interview and stated Defendant had last raped her in March 2015, the month before the interview. E.G. stated Defendant had sex with her. She explained Defendant "spread my legs and then he'll put his private stuff on my private." She further stated, "He would try to put it - he told me he would try to put it all the way in." "[T]hen he said he couldn't do that because it won't go through or something like that, and he told me not to do it to nobody else but him." E.G. was asked if Defendant "put his private stuff inside of your private stuff," and E.G. nodded affirmatively. E.G. later described ejaculation by Defendant but did not indicate on which occasion this occurred.

E.G. told Pleasant that Defendant once hugged her and asked if she was throwing up. She told Defendant she gagged or threw up every time she ate. E.G. said Defendant responded, "'Oh that - because that's a sign if you're . . . pregnant." Defendant also told her she looked pregnant because her stomach was getting bigger. E.G. reported that Defendant used a condom twice.

During her April 7, 2016 interview, E.G. discussed her relationship with her mother. E.G. stated that after she returned home the first time from foster care:

> [E]verything was going good. No pressure was put on me. I decided - while I was home, I decided to change up a little bit of the story that happened. The reason why is because I noticed there's a lot of things that been going on [sic] on with my mother.

E.G. stated that she felt she was treated differently than her siblings. E.G. then discussed her mother's reaction to her having a boyfriend. E.G. stated she had not done anything sexual with her boyfriend although her mother thought she had. E.G. acknowledged that her mother accused her of making false statements about Defendant. E.G. further stated, "And now I'm getting taken away, going back to foster care for however many months it takes her to control her anger and to realize

that I'm, basically, always the same as I used to be." E.G. stated she had not seen her father at their house since he was taken to jail. However, she had seen him pass by the store while she was there. E.G. later stated:

> **E.G.:** But like I tell momma, I forgave him but there's some days I'm, like, I - you know, like I said, like my boyfriend a chance [sic] and she (Incomprehensible words) but it was something that wadn't [sic] true about me and she was, like, "I don't think I'm going to be able to move on with life, and I'm not going to be able to forgive myself for what my father did," like I said, when I'm grown up, I'm not gonna [sic] forgive myself, if I have to see my father go to jail for what I did.

> **Joanna Pleasant:** And what did you do?

> **E.G.:** Be, basically, for real, I'm thinking, that none of this would have happened.

> . . . .

> **E.G.:** - if I would not have said nothing [sic].

> **Joanna Pleasant:** But did you choose for it to happen?

> **E.G.:** No.

Dr. Jennifer Olson Rodrigues, a pediatrician, testified that she performed a "thorough evaluation of [E.G.'s] private area" on April 15, 2015, in conjunction with her claim of sexual abuse." Before the physical examination, Dr. Rodrigues met with E.G. to get a medical history and her version of abuse she had been suffering. When asked about E.G.'s demeanor at the time, Dr. Rodrigues stated:

> I remember she - I kind of asked her about how she was doing and she had said she felt bad. She had a lot on her mind. She had been having to talk to a lot of people about what had been going on and it was kind of a scary thing, that she had told them the truth. . . . And then she had talked about it was like, having a dream that you want to wake up from, but she just couldn't wake up from. Then we talked a little bit, you know, I try not to ask detailed questions. I knew she - it was a hard thing for her to talk about, but she had talked about the thing that happened, it hurt, and it hurt when she peed. It hurt to walk. It would sting real bad when she peed. And I asked where. She said her privacy, and then she pointed down to her front area. And then I asked how she was touched, and she said it was with a man's privacy part[.]

When she performed the physical examination, Dr. Rodrigues found no signs of trauma, and she noted that E.G.'s hymen was intact. She explained, however, that in sexual abuse cases, the victims often have normal physical examinations.

At trial, E.G. testified that her father began having sexual intercourse with her on her thirteenth birthday. E.G. recalled that Defendant was mad because one of her male friends from school had given her a teddy bear. Her mother was at work, and her siblings were outside playing. E.G. further testified that Defendant took her into her mother's bedroom and told her to pull down her pants so that he could give her a whipping. Afterward, Defendant pulled her underwear down to her ankles and told her to lay in the bed. He had pulled down his underwear and pants too. According to E.G., Defendant then touched her private area with his private area. When asked if Defendant was "moving his privacy" when his "privacy was in your privacy," E.G. replied, "Yes, ma'am." E.G. indicated that Defendant ejaculated and then "He pulled out." E.G. testified that Defendant used a condom once. According to E.G., Defendant told her "not to tell mom because if he goes to jail, he will get out and will beat me."

E.G. also testified at trial that her family did not believe her allegations against Defendant. She explained that she had to enter foster care and that she had several hospital stays after she began talking about hurting herself. E.G. admitted that after she returned home, she used drugs, drank, and snuck out. She also acknowledged telling a counselor that Defendant was going to their house even though he had not done so. E.G. was further questioned as follows:

Q Have you ever told your brother or anybody you were just going to say it didn't happen?

A Yes, ma'am.

Q Why were you going to say that?

14

A       I wanted my family back together.

Q       Even your dad?

A       Yes, ma'am.

E.G. stated that she had forgiven her father for what he did to her, but she nonetheless confirmed that the sexual abuse did happen.

Santiago Gonzalez, Jr., (Junior) Defendant's son, was called as a defense witness. Junior testified he never saw Defendant act inappropriately with E.G. He testified that E.G. had lied to him, including saying she had changed the baby's diaper and completed her chores when she had not done so. Junior indicated he was not subpoenaed to testify but appeared because his father's "lawyer told me that we needed to be up here."

In *State v. Spears*, 504 So.2d 974 (La.App. 1 Cir.), *writ denied*, 507 So.2d 225 (La.1987), the defendant was convicted of second degree murder. The offense occurred on December 2, 1984, at the apartment of the victim's sister, Cynthia Cavalier. Cynthia was the defendant's ex-girlfriend, and the two had a child together. The defendant filed a motion for new trial based on newly discovered evidence. The first circuit addressed the motion as follows:

> It is the defendant's contention that Cynthia committed perjury when she testified that she had ended her relationship with the defendant approximately two years before the shooting incident occurred. At the trial, in an attempt to establish that their relationship had not ended two years earlier, the defendant produced a note addressed to him and allegedly written in October, 1984, by Cynthia. On cross-examination, Cynthia denied she had written this note. At the hearing on the motion for new trial, the defendant introduced this note, as well as several other notes and letters which were allegedly written to him by Cynthia. Four of these notes and letters were signed "Cynthia". The defendant also introduced evidence that a handwriting analysis expert, Robert Foley, had examined these notes and letters and concluded that they were all written by the same person. The defendant argued that this evidence proves that Cynthia committed perjury by testifying that she had not written the note on which she was questioned at trial and that she committed perjury by testifying

that her relationship with the defendant had ended two years before the shooting incident.

. . . .

In this case, the defendant has failed to show that this new evidence could not have been discovered before trial by the exercise of due diligence. In fact, it is apparent that the defendant possessed at least one of these notes before trial, since he produced this note at the trial and cross-examined Cynthia about it. Even if the defendant was surprised when Cynthia denied that she had written this note, the defendant could have requested a recess in order to produce expert testimony that the handwriting on the note was Cynthia's. We find that the trial court did not abuse its discretion in denying the defendant's motion for new trial on that basis.

*Id.* at 978-79.

In *State v. Armstead*, 14-36 (La.App. 4 Cir. 1/28/15), 159 So.3d 502, *writ denied*, 15-392 (La. 1/8/16), 184 So.3d 692, the defendant was convicted of felony carnal knowledge of a juvenile. He alleged the trial court erred when it denied his motion for new trial considering newly discovered evidence in the form of the victim's statement that she did not have sexual intercourse with him. At the hearing on the motion for new trial:

[T]he victim testified that Mr. Armstead did not rape her and that they did not have sexual intercourse. She, however, could not explain how his sperm found its way into her vagina. The victim further stated that she had been advised by the prosecution that she did not need to appear for the first day of trial because a jury was going to be selected for trial, and she was never informed of the need for her to appear later to testify. The victim also acknowledged, on cross-examination by the prosecution, that while she was served with a subpoena, she never intended to appear and testify at trial. She stated that she did not want to come to the trial and was not willing to testify for the prosecution.

*Id.* at 519. The fourth circuit concluded the trial court did not abuse its discretion in refusing to grant the motion. It found the defendant "did not show that the failure to discover the new evidence . . . was not attributable to his lack of diligence." *Id.* at 520. The court noted that the defendant "could have spoken with the victim prior to trial, or subpoenaed the victim to testify at trial," but that the

16

defendant "did not explain, however, why he failed to pursue either course of conduct at the motion hearing." *Id.*

After reviewing the evidence and considering the arguments on appeal, we conclude that Defendant failed to show that the exercise of reasonable diligence by him or his attorney would have not uncovered the witnesses, Meshell and McDonald, before or during trial. Both knew of the alleged statements by E.G. before trial, the two were relatives of the victim, Meshell babysat the victim, and Meshell was present in the "victim's room" when the verdict was returned. Moreover, at trial, E.G. admitted she had stated she was "going to say it didn't happen" because she wanted her family back together. That testimony should have put defense counsel on notice that he needed to consult the victim's relatives.

Defendant attacks E.G.'s credibility and argues the version of the events presented by her changed over time. E.G.'s credibility was at issue during trial, and she and other witness were thoroughly cross-examined about her credibility. In addition, E.G. admitted that she said she was going to say the offense did not occur. Accordingly, this case is readily distinguishable from *Ward*, 167 So.3d 592. Furthermore, we find that Defendant did not establish that the testimony of Meshell and McDonald would probably have produced a different verdict at retrial.

We find *Ward* distinguishable from the present matter. Unlike the victim in *Ward*, the victim herein, E.G., did not offer varying accounts of what Defendant did to her. Thus, as the appellate courts did in *Spears*, 504 So.2d 974, and *Armstead*, 159 So.3d 502, we conclude that the trial court did not abuse its discretion in denying Defendant's First Amended Motion for New Trial.

17

*Defendant's Term of Probation*

In his second assigned error, Defendant contends the trial court imposed an illegal sentence of six years supervised probation. At the time Defendant was sentenced, La.Code Crim.P. art. 893 provided, in pertinent part:

A. When it appears that the best interest of the public and of the defendant will be served, the court, after a first or second conviction of a noncapital felony, may suspend, in whole or in part, the imposition or execution of either or both sentences, where suspension is allowed under the law, and in either or both cases place the defendant on probation under the supervision of the division of probation and parole. The court shall not suspend the sentence of a conviction for an offense that is designated in the court minutes as a crime of violence pursuant to Article 890.3,[6] or of a second conviction if the second conviction is for a violation of R.S. 14:73.5, 81.1, or 81.2. The period of probation shall be specified and shall not be less than one year nor more than five years. The suspended sentence shall be regarded as a sentence for the purpose of granting or denying a new trial or appeal[.]

. . . .

C. If the sentence consists of both a fine and imprisonment, the court may impose the fine and suspend the sentence or place the defendant on probation as to the imprisonment.

Defendant's six-year probationary term exceeds the maximum authorized by La.Code Crim.P. art. 893. "An illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review." La.Code Crim.P. art. 882(A). Accordingly, we will amend Defendant's sentence to provide for a period of five years probation.

*The Condition of Defendant's Probation*

In his third assignment of error, Defendant contends the condition of probation requiring him to not have contact with anyone under the age of seventeen, including his children other than E.G., is excessive and violates

---

[6] Crime against nature is not listed as a crime of violence in La.Code Crim.P. art. 890.3.

La.Code Crim.P art. 895 and his rights under La.Const. art. 1, § 2 and § 20 and U.S. Const. amends. VIII and XIV.

Louisiana Code of Criminal Procedure Article 895(A) provides, in part: "When the court places a defendant on probation, it shall require the defendant to refrain from criminal conduct and to pay a supervision fee to defray the costs of probation supervision, and it may impose any specific conditions reasonably related to his rehabilitation[.]"

At Defendant's sentencing hearing, the trial court stated: "one of the conditions of probation is going to be that you have no contact with anyone under 17 years of age; that, of course, you have absolutely no contact with the victim in this case." Defense counsel then asked whether Defendant could be allowed contact with his son, Kevin. The trial court confirmed that the condition applied to everyone "under 17 years-of-age," and Defendant assured that he could abide with the condition. Defense counsel did not object to the probationary condition at that time nor did he file a motion to reconsider sentence pursuant to La.Code Crim.P. art. 881.1 alleging the condition was improper or excessive. Accordingly, we conclude that Defendant waived review of this issue.[7] *See* La.Code Crim.P. art. 841.

---

[7]We note, however, that under La.Code Crim.P. art. 822, Defendant may still seek to have the conditions of his probation modified or terminated by the trial court.

The trial court has the power to "modify, change, or discharge the conditions of probation, or add further conditions authorized by [La.Code Crim.P. art. 895]" at any time during a defendant's probationary period. La.Code Crim.P. art. 896. However, "[i]n a felony case the court may terminate the defendant's probation and discharge him at any time after the expiration of one year of probation." La.Code Crim.P. art. 897. If discharged after the expiration of at least one year of probation, "the defendant shall have satisfied the sentence imposed." La.Code Crim.P. art. 898.

*State v. Sneed*, 04-540, p. 5 (La.App. 3 Cir. 11/10/04), 886 So.2d 662, 665.

19

*Defendant's Order of Notification to Sex Offender*

In his fourth assignment of error, Defendant contends that a portion of the Order of Notification to Sex Offender (the Order) filed in the record on May 25, 2017, is erroneous. The Order states that Defendant "has pled guilty to or has been found guilty of a violation of R.S. 14:89.1(A)(2);14:27." Although Defendant was originally charged with aggravated crime against nature, which is a violation of La.R.S. 14:89.1(A)(2), he was found guilty of the responsive verdict of attempted crime against nature, a violation of La.R.S. 14:89 and La.R.S. 14:27. Accordingly, the Order incorrectly sets forth the offense for which Defendant was convicted. Defendant notes that the registration period listed in the order is correct, but he asks this court to remand the matter for correction of the error. The State defers to this court on this assignment of error.

Defendant's conviction for attempted crime against nature requires Defendant to register as a sex offender for twenty-five years. La.R.S. 15:541(25)(n); La.R.S. 15:544(B)(1). On the other hand, a conviction for aggravated crime against nature requires lifetime registration. La.R.S 14:89(A)(2); La.R.S. 15:541(2)(j); La.R.S. 15:544(B)(2)(a). To prevent any problems in the future, we will direct the trial court to correct the Order to list the crime for which Defendant was ultimately convicted.

**DECREE**

Defendant's sentence is amended to provide for five years supervised probation and is affirmed as amended. Additionally, this matter is remanded to the trial court for correction of the Order of Notification to Sex Offender to provide that Defendant was found guilty of attempted crime against nature, a violation of La.R.S. 14:89 and La.R.S. 14:27.

**SENTENCE AMENDED AND AFFIRMED AS AMENDED. REMANDED WITH INSTRUCTIONS.**